

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| John Doe, a pseudonym,<br><br>Plaintiff,<br><br>v.<br><br>Massachusetts Institute of Technology,<br><br>Defendant. | Civil Action No. 1:23-cv-11490-PBS |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe[1] ("Plaintiff") respectfully submits this employment action against the Defendant, Massachusetts Institute of Technology ("MIT") alleging violations of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a). Accordingly, Plaintiff states as follows:

### PARTIES

1. Plaintiff John Doe ("Plaintiff") is an individual who was employed by Defendant Massachusetts Institute of Technology at all relevant times to this action. Plaintiff currently resides in Salem, Massachusetts.

2. Defendant Massachusetts Institute of Technology ("MIT") is a private corporation whose principal place of business is in Cambridge, Massachusetts, and a federally-funded private university with a total student body of more than 11,000 students.

---

[1] Responding to Defendant's Motion to Dismiss for Plaintiff's failure to state his real name, Plaintiff filed a Motion to Proceed Under Pseudonym, Ex-Parte, concurrently with the filing of the original Complaint, which Plaintiff is willing to share with Defendant subject to a suitable protective order. Plaintiff is informed that a later-filed related case is pending in this District, and the plaintiff in that case is imminently filing notice, according to the applicable Local Rules, so that the respective pseudonym motions in these two cases may be considered jointly. Moreover, Plaintiff would seek to amend his Motion to Proceed Under Pseudonym with the Court's permission in light of new information about the related case.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under federal law, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Defendant MIT is incorporated and maintains its principal place of business in this judicial district, the conduct giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

5. Between about November 2018 and May 2020, Plaintiff was employed by the Massachusetts Institute of Technology ("MIT") as an administrative staff member in a scientific laboratory (the "Laboratory"), one of MIT's educational programs, where he performed satisfactorily at his job duties.

6. MIT knowingly maintains policies, customs, and practices that lead to an unreasonable risk that prohibited discrimination and harassment, including retaliation, will be perpetuated in particular by its laboratory supervisors in its scientific research programs. These include:

    a. A policy and practice of inadequate training and oversight of laboratory supervisors, as evidenced by, *inter alia*, the virtually complete lack of nonretaliation training that MIT required of Plaintiff's Supervisor and all similar laboratory supervisors who were not MIT faculty; MIT's years-long failure to modify such training practices even after it obtained statistics in community surveys indicating gaps in awareness of its nonretaliation policies and consequences thereof; demonstrated repeated failures by employees with

oversight functions, like those in MIT's Office of General Counsel and Human Resources department, to detect instances of possible retaliation by Plaintiff's Supervisor across multiple years, even when these oversight employees were on notice both that his conduct followed closely in time with protected activity and matched the types of possible retaliation enumerated in MIT's written policies, reflecting inadequate training of employees with oversight roles;

b. MIT's policy and practice not to collect reasonable, common-sense data to assess the performance of its written nondiscrimination and nonretaliation policies, as evidenced by, *inter alia*, MIT's exceptional history as an institution capable of using advanced analytics; MIT's ignorance of repeated community requests evaluate such data; and failure by MIT to collect such data consistently with written compliance guidelines from the Office of Federal Contractor Compliance Programs;

c. Insufficient enforcement of its written nondiscrimination and nonretaliation policies against laboratory supervisors by using reasonable sanctions, as evidenced by, *inter alia*, its repeated failure to appropriately sanction such supervisors even when retaliation had occurred, including in at least one prior instance involving a laboratory supervisor in Plaintiff's Supervisor's department, and MIT's continued failure to promptly implement sanctions after a recent institute-wide report indicated they were necessary, reflecting a continuing policy not to do so;

d. A practice at MIT colloquially called "the professor is always right" whereby unreasonable standards are used to investigate potential discrimination or

retaliation by laboratory supervisors, as evidenced by, *inter alia,* an article about this policy in MIT's student newspaper; MIT's knowledge of proper investigatory standards; and MIT's repeated failure to reasonably evaluate evidence of pretext when investigating possible laboratory supervisor retaliation, as demonstrated in reports like its position statements to administrative agencies involving Plaintiff's Supervisor, and similar evidence related to other laboratory supervisors;

e. A policy and practice not to promptly and equitably investigate or otherwise address credible reports of prohibited discrimination or retaliation by laboratory supervisors that MIT receives through channels other than formal complaints, even when they are repeated, as evidenced by, *inter alia,* the numerous verbal and written complaints received by high-level MIT administrators reflecting potential gender discrimination or hostile work environments during the Ito-Epstein events at MIT, and MIT's failure to initiate investigations regarding the particular risk of gender discrimination or hostile environment sexual harassment by the employees involved with Ito-Epstein events who remained at MIT;

f. A policy and practice of grievance procedures that are not compliant with Title IX whenever employees also file complaints with administrative agencies, including failure to comply with the prompt and equitable resolution of employee complaints and the maintenance of confidentiality in those instances, as evidenced by, *inter alia,* MIT's conduct in connection with administrative complaints against Plaintiff's Supervisor and others;

g. MIT's failure to respond promptly and equitably, and in such a way that is reasonably calculated to remedy discrimination, to credible reports of systemic

    risks of discrimination, including retaliation, such as those it has received from advocacy groups in its community since at least the 1990's;

h. The express exclusion of common modes of discrimination and retaliation by laboratory supervisors (e.g., removal from research publications, grade changes, termination) from MIT formal grievance procedures to address discrimination and retaliation, as evidenced by, *inter alia,* its formal written policies and associated practices, and documentation of this exclusion preventing the fair and equitable operation grievance procedures repeatedly in Plaintiff's Supervisor's department;

i. Exclusion of MIT employees who are paid by temporary agencies, like Plaintiff, from MIT's formal discrimination and retaliation grievance procedures despite those workers' often long-term work at MIT, as evidenced by MIT's formal written policies and associated practices;

j. An unreasonable absence of mechanisms to transition all types of laboratory workers to different supervision when there is a credible risk of discrimination or retaliation by a laboratory supervisor, as evidenced by, *inter alia*, the operation of laboratory transitions at MIT, and MIT's knowledge and failure to reasonably act on this as an identified area of particular risk even after an institute-wide report, reflecting a persistent, intentional policy of indifference;

k. Policies and practices that tolerate or even favor so-called "ethics washing" defenses to discrimination, or remedies for it, as evidenced, *inter alia*, in MIT's statements in administrative agency proceedings; and MIT's unreasonable failures to train supervisors to matching particular risks of discrimination with relevant and targeted remedies.

    l. A set of policies and practices that do not reasonably protect workers' confidentiality including in connection with complaints of discrimination, evidenced by *inter alia*, MIT's approaches to confidentiality in the set of cases and complaints involving Plaintiff's Supervisor and in matters involving other laboratory supervisors.

7. MIT has had actual knowledge since years before any misconduct by Plaintiff's Supervisor against Plaintiff began, that gender discrimination, sexual harassment, and retaliation were present in its scientific research laboratories and perpetuated by laboratory supervisors and would obviously continue as a result of these policies, customs, and practices. For example, it had actual knowledge of these things from quantitative surveys, prior complaints involving laboratory supervisors, and other credible reports and analyses of conduct in its laboratories.

8. The collective effect of these policies, customs, and practices of deliberate indifference to retaliation by MIT's laboratory supervisors in its scientific research programs is a culture of impunity in which retaliation is known to be tolerated, creating a higher risk that it will occur, and in which protected activity is chilled due to the perception by workers of this culture. Furthermore, the culture of retaliation means that patterns of gender discrimination and sexual harassment are also more likely to persist due to less, or less effective, reporting.

9. While Plaintiff worked in the Laboratory, it was pervaded with sex- and gender-based discrimination. Among other actions, Plaintiff's supervisor ("Plaintiff's Supervisor") violated MIT's Consensual Sexual or Romantic Relationships policy by supervising two women with whom he had sexual or romantic relationships and making laboratory

members aware of that fact; relentlessly excluded scientists who were not white or Asian men from virtually all types of professional opportunities like conference participation or research publication credit, a pattern that was evident both statistically and anecdotally; and failed to supervise a doctoral student who regularly made offensive gender-based remarks and used offensive epithets around the laboratory.

10. Furthering a hostile and discriminatory work environment, after September 2019, Plaintiff's Supervisor continued to work with Joichi Ito, the former director of the Media Lab, a large MIT research division, and to cause members of the Laboratory to participate in this work, after Ito had resigned from MIT in connection with Ito's association with convicted sex offender Jeffrey Epstein. Beginning shortly after September 2019, Plaintiff's Supervisor disregarded the repeated concerns of his laboratory employees that this conduct was offensive to survivors of sexual abuse and assault, who are more likely to be women and gender minorities, and Plaintiff's Supervisor disregarded written accounts from hundreds across MIT that Ito's continued involvement was humiliating and offensive and that it interfered in workers' ability to participate in MIT's educational programs. Ito's involvement in the Laboratory differentially impacted at least two individuals in the Laboratory who were such survivors, including Plaintiff, and Plaintiff's Supervisor knew this.

11. Additionally, Plaintiff's Supervisor violated the spirit and letter of MIT's Affirmative Action Serious Search Policies, which then implemented MIT's Affirmative Action Plan as required of it as a federal contractor, by misusing MIT's temporary hiring mechanisms to hire almost exclusively White and Asian male technical workers from his personal network. The practice comprised about a dozen hires over multiple years and, upon

information and belief, continues to this day. This hiring pattern corresponded with gender stereotypes and reflected an intent to discriminate by Plaintiff's Supervisor.

12. Upon information and belief, the ability for MIT supervisors to sidestep the spirit and letter of affirmative action requirements continues today.

13. Plaintiff reported his concerns of gender discrimination and sex discrimination in the Laboratory, as well as his concerns of violations of MIT's affirmative action policies, in a series of meetings with Plaintiff's Supervisor between about late September 2019 and January 2020. These meetings coincided with reporting and investigation of Jeffrey Epstein's association with MIT and Joichi Ito's involvement in it, as well as Plaintiff's work on a conference led by Supervisor that had extremely gender-skewed participation exclusive of women, a fact remarked on by its participants to Plaintiff.

14. Around the start of Plaintiff's protected activity in October 2019, Plaintiff's Supervisor began demeaning and/or antagonistic conduct like asking Plaintiff to arrive early at the Laboratory to watch his dog, berating Plaintiff in front of colleagues for being late to work when Plaintiff was virtually always the first in the office, and removing Plaintiff's permission for certain remote work without reasonable justification.

15. In January 2020, nearly coincident with the release of MIT's investigative report about Jeffrey Epstein and Joichi Ito, Plaintiff's Supervisor informed a scientist in the Laboratory ("Scientist 1') that he (Plaintiff's Supervisor) intended to terminate Plaintiff. He informed Scientist 1 that he wished to avoid legal action against himself for doing so, and asked Scientist 1 for advice on that topic and asked Scientist 1 to communicate with him about the decision to terminate Plaintiff using a USB drive, then delete the communications. Within about a day or even hours of Scientist 1 using this unusual USB

communication plan, Plaintiff's Supervisor contacted MIT Human Resources about placing Plaintiff on a Performance Improvement Plan (PIP) intended to cover up the termination decision that Plaintiff's Supervisor had already made.

16. Contrary to any notion of Plaintiff's underperformance, Plaintiff's Supervisor and one of his staff members invited Plaintiff to continue additional work in the laboratory at the end of the PIP. Plaintiff's colleagues also remarked on Plaintiff's strong work performance.

17. The week of May 20, 2020, Plaintiff raised another concern to Plaintiff's Supervisor about the transition of temporary workers to regular staff positions, to better conform with the proper use of temporary worker mechanisms at MIT. This comment was part of Plaintiff's ongoing discussion with Plaintiff's Supervisor about proper use of the temporary worker hiring mechanism, which included avoiding discriminatory patterns.

18. Plaintiff's Supervisor terminated Plaintiff on May 20, 2020, which effectuated the plan that Plaintiff's Supervisor had made and communicated in about January 2020 to terminate Plaintiff. This termination was because of, and in retaliation for, for Plaintiff's opposition to the sex- and gender-based discrimination and harassment occurring in the Laboratory.

19. Upon information and belief, shortly after Plaintiff's termination, Plaintiff's Supervisor's staff member ("Staff Member 1"), with Plaintiff's Supervisor's accord, published false and defamatory statements about Plaintiff's work performance on the laboratory's messaging system to dozens of colleagues. This was a departure from normal procedures and reflected Plaintiff's Supervisor's animus toward Plaintiff.

20. Additionally, upon information and belief Plaintiff's Supervisor and Staff Member 1 convened a staff meeting to imply falsely that mental health issues were related to

Plaintiff's termination. This, too, was a departure from normal procedures and reflected Plaintiff's Supervisor's animus toward Plaintiff.

21. Upon information and belief, around the summer of 2020, Staff Member 1 warned Scientist 1 not to raise concerns of misconduct to Plaintiff's Supervisor or reprisals would occur, using words to the effect of "look what happened to [Plaintiff]", comparing Plaintiff's retaliatory termination to one in the Staff Member 1's previous workplace.

22. Scientist 1 reported to a federal administrative agency in early 2021 that Plaintiff had been retaliated against, a claim that MIT did not promptly and equitably investigate.

## CLAIMS

### COUNT ONE
### Violation of Title IX
### Retaliation – Official Act
### (Against Defendant MIT)

23. Plaintiff incorporates by reference the preceding allegations.

24. Plaintiff was employed by MIT where he participated in its educational programs.

25. At all times relevant to this action, MIT has received, and continues to receive, federal financial assistance.

26. Title IX prohibits MIT from retaliating against an employee in its educational programs who complains of or opposes gender discrimination or sexual harassment.

27. In discussions with Plaintiff's Supervisor, Plaintiff engaged in protected activity by complaining of and opposing gender discrimination and sexual harassment that Plaintiff reasonably perceived were occuring in the MIT research laboratory where he worked.

28. After Plaintiff's protected activity, MIT terminated him, which was an adverse employment action.

29. Plaintiff's termination was an official act of MIT that Plaintiff's Supervisor decided upon then set in motion with MIT's authority. In particular, MIT gave Plaintiff's Supervisor virtually unfettered authority to terminate employees like Plaintiff.

30. There was a causal connection between Plaintiff's protected activity and his termination. For example, Plaintiff's Supervisor was the person who decided to terminate Plaintiff, and he had knowledge of Plaintiff's protected activity when he did so. Additionally, there was close temporal proximity, of no more than about a month, between Plaintiff's most recent opposition or complaint of gender discrimination and sexual harassment to Plaintiff's Supervisor, and Plaintiff's Supervisor's decision to terminate Plaintiff. Furthermore, *inter alia*, Plaintiff's Supervisor engaged in new, antagonistic activity toward Plaintiff shortly after Plaintiff's protected activity began that continued through Plaintiff's termination, including demeaning Plaintiff by assigning him to watch a dog, berating him in front of colleagues, and reducing his remote work.

31. MIT's actions, particularly its retaliatory termination of Plaintiff, would dissuade a reasonable participant in its educational programs from making or supporting a charge of discrimination.

32. As a result of MIT's actions, Plaintiff has suffered damages, including lost wages and benefits, lost job opportunities, potential future wage loss, emotional distress and physical sickness, and damage to his reputation.

33. Plaintiff is entitled to all legal and equitable remedies available under Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT TWO
## Violation of Title IX
## Retaliation -- Deliberate Indifference to Retaliatory Acts of Employees
(Against Defendant MIT)

34. Plaintiff incorporates by reference the preceding allegations.

35. In addition to retaliating against Plaintiff by its official act of terminating Plaintiff,[2] MIT retaliated against Plaintiff by its deliberate indifference to the retaliatory acts of its employees, which encompassed the retaliatory acts of Plaintiff's Supervisor. These retaliatory acts by Plaintiff's Supervisor included:

   a. terminating Plaintiff's employment;

   b. circulating false information about Plaintiff's work performance and the reasons for Plaintiff's dismissal, or authorizing his subordinate(s) to do so; and

   c. organizing a staff meeting to imply falsely that mental health issues were a factor in Plaintiff's termination, or authorizing his subordinate(s) to do so.

36. Before Plaintiff's Supervisor took these actions, appropriate persons at MIT with authority to implement corrective measures were on actual notice of the risk of retaliation in MIT's educational programs, in particular retaliation by the laboratory supervisors in its scientific research programs against the workers they supervised.

37. MIT knew that its policies, customs, and practices unreasonably exposed such participants (including Plaintiff) to retaliation by such supervisors. Nonetheless, MIT maintained a policy, custom, and practice of deliberate indifference to retaliation by laboratory supervisors in these scientific research programs, leaving Plaintiff vulnerable to it.

---

[2] Plaintiff asserts Count Two in addition to and in the alternative to Count One.

38. MIT, despite receiving multiple credible complaints and reports regarding similar retaliatory behaviors by such laboratory supervisors, and collecting statistics such that MIT knew that these were part of a pattern, failed to take adequate corrective action, thereby demonstrating a pattern of deliberate indifference to known instances of retaliation which was part of a policy, custom, and practice. MIT's policy, custom, and practice of deliberate indifference to the risk of retaliatory acts by laboratory supervisors in its scientific research programs included:

    a.  Inadequate training and oversight of laboratory supervisors;

    b.  Failure to collect reasonable, common-sense data to assess the performance of its written nondiscrimination and nonretaliation policies;

    c.  Insufficient enforcement of its written nondiscrimination and nonretaliation policies against laboratory supervisors by using reasonable sanctions;

    d.  A practice colloquially called "the professor is always right" where unreasonable, overly deferential standards are used to investigate potential discrimination or retaliation by laboratory supervisors;

    e.  Failure to promptly and equitably investigate or otherwise address credible reports of prohibited discrimination or retaliation by laboratory supervisors that MIT receives through channels other than formal complaints, even when they are repeated;

    f.  Failure to adopt grievance procedures compliant with Title IX when employees also file complaints with administrative agencies, including compliance with the prompt and equitable resolution of employee complaints and the maintenance of confidentiality;

g. Failure to respond promptly and equitably to credible reports of systematic risks, such as those from advocacy groups in the community;

h. Exclusion of common modes of discrimination and retaliation by laboratory supervisors (e.g., removal from research publications, grade changes, termination) from its formal grievance procedures to address discrimination and retaliation;

i. Exclusion of temporary workers from its formal discrimination and retaliation grievance procedures despite those workers' often long-term work at MIT;

j. An unreasonable absence of mechanisms to transition all types of laboratory workers to different supervision when there is a credible risk of discrimination or retaliation by a laboratory supervisor;

k. The use or tolerance of "ethics washing" defenses to discrimination or retaliation; and

l. Failure to reasonably protect workers' confidentiality including in connection with complaints.

39. In addition to MIT's policy, custom, and practice of deliberate indifference to the risk of retaliatory acts by laboratory supervisors in its scientific research program, MIT also maintained a policy, custom, and practice of deliberately indifference to the particular risk of retaliatory acts by employees working in or with the MIT laboratories with which Joichi Ito had closely associated and/or continued to associate after his resignation from MIT, which included Plaintiff's Supervisor's laboratory. MIT failed to reasonably and promptly target its efforts to prevent, detect and redress gender discrimination, including retaliation, in those laboratories, despite knowing of a risk of retaliation by employees in

those programs from reports, complaints and other information that MIT received in connection with the Ito-Epstein controversy at MIT.

40. MIT knew that this policy, custom, and practice of deliberate indifference unreasonably exposed such participants (including Plaintiff) to retaliation by such employees, leaving Plaintiff vulnerable to it. Nonetheless, MIT maintained such a policy, custom, and practice of deliberate indifference.

41. The retaliation that Plaintiff experienced by Plaintiff's Supervisor was caused by MIT's policy, custom, and practice of deliberate indifference to retaliation by its employees, by leaving Plaintiff vulnerable to such conduct, which reflected MIT's lax enforcement of its nonretaliation policies and a broader institutional culture that tolerates such behaviors.

42. MIT's actions, particularly its policy, custom, and practice of deliberate indifference to retaliation by certain of its employees, would dissuade a reasonable participant in its educational programs from making or supporting a charge of discrimination.

43. As a direct and foreseeable result of MIT's actions, Plaintiff has suffered damages, including lost wages and benefits, lost job opportunities, potential future wage loss, emotional distress and physical sickness, and damage to his reputation.

44. Plaintiff is entitled to all legal and equitable remedies available under Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant;

B. Award Plaintiff damages for lost wages and benefits and other compensatory damages resulting from the alleged claims;

C. Award Plaintiff damages for emotional distress and physical sickness resulting from the alleged claims;

D. Award Plaintiff punitive, exemplary, nominal, and treble damages, if applicable;

E. Award Plaintiff prejudgment and post-judgment interest on all amounts awarded;

F. Award Plaintiff reasonable attorney's fees and costs;

G. Issue an injunction ordering Defendant to implement and enforce policies, procedures, and training programs aimed at eliminating and preventing the systemic issues that caused and perpetuated the alleged misconduct, including but not limited to, promoting equal opportunity, preventing discrimination and retaliation, and ensuring compliance with relevant laws and regulations; and

H. Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED

DATED: December 21, 2023

By: */John Doe/*

John Doe